ED KROUPA, APPELLEE, V. TAMMY GINN, APPELLANT.

511 N.W.2d 795

Filed February 8, 1994.   No. A-93-255.

Josephine Walsh Wandel and Bernard L. McNary, of Wandel Law Offices, P.C., for appellant.

Wesley S. Dodge for appellee.

SIEVERS, Chief Judge, and IRWIN and MILLER-LERMAN, Judges.

MILLER-LERMAN, Judge.

In this paternity action filed by Ed Kroupa, the district court for Douglas County awarded custody of Travis Kroupa to Ed, subject to specified visitation by Travis' mother, Tammy Ginn. Tammy primarily alleges on appeal that the district court improperly exercised and retained jurisdiction in this case. She also argues that there is no authority for an ex parte or temporary custody order in a paternity suit and that visitation was not awarded in accordance with the best interests of the child. For the reasons recited below, we find that the district court had no jurisdiction in this case.

## STANDARD OF REVIEW

Matters involving child custody are initially entrusted to the discretion of the trial court. *Grindle v. Grindle*, 237 Neb. 302, 465 N.W.2d 749 (1991). However, statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below. *State on behalf of Matchett v. Dunkle*, 244 Neb. 639, 508 N.W.2d 580 (1993).

## BACKGROUND

Tammy and Ed, aged 17 and 23 respectively at the time they began dating, engaged in an intimate relationship which lasted approximately 4 to 5 years. The parties do not dispute that Ed is the father of Travis, born March 20, 1989, in Omaha. The parties remained in Omaha until January 1990. From January 1990 until September 1991, Tammy and Travis lived in Council Bluffs, Iowa.

Tammy ended her relationship with Ed in July or August 1991. Travis visited his paternal grandparents in Arkansas in September 1991, while Tammy searched for a job and a place to live. According to Tammy, Ed brought Travis to Omaha from Arkansas on October 11, but did not return Travis to Tammy as planned or inform her that Travis was in Omaha.

Ed filed a petition in the district court for Douglas County on October 9, 1991, asking the court to establish paternity of Travis, to award custody of Travis to Ed with accompanying child support from Tammy, and to award Ed attorney fees and costs. On the same date, the court issued an ex parte order placing temporary care, custody, and control of Travis with Ed until further order of the court.

### Hearing on Temporary Custody.

The parties appeared in Douglas County District Court on October 16 and 18, 1991, to determine whether that court had jurisdiction in the case. The court stated that it was simultaneously determining the best interests of the child.

Tammy testified that following Travis' birth, the parties lived with Ed's parents in Omaha until January 1990. Thereafter, Tammy and Travis lived in Council Bluffs. Tammy testified that she has received aid to dependent children payments since February 1990 and that she has lived in Iowa with Travis in federally assisted housing and in her mother's home. Tammy denied that Ed lived full time with her and Travis in Iowa, although she acknowledged that he sometimes spent the night at her apartment.

Tammy testified that, except for a 1½-month period in 1989, she did not work outside the home from the time of Travis' birth until 2 weeks before the hearing. She stated that

she had always been responsible for the daily care of Travis. Tammy testified that her mother cares for Travis in her absence and that her younger sister occasionally babysits for short periods of time.

Tammy stated that her relationship with Ed has been violent and that she is afraid of him. She said that she had to go to the hospital in 1989 for treatment of a fractured wrist sustained in a beating from Ed and that she has since been beaten by Ed in her home. Tammy testified that Ed told her that he would drop this lawsuit in exchange for Tammy's resumption of their relationship. Tammy admitted to using drugs in the past, but stated that she does not now use drugs.

Ed testified that he was concerned about Tammy's job in a bar. Ed claimed that Tammy used marijuana. He stated that he could provide a more stable home for Travis than could Tammy. He acknowledged that he had used drugs in the past, including marijuana, cocaine, and "crank." He stated that he had not used drugs for the 4 months prior to the hearing because it was in the best interests of his son.

Ed testified that he lived with Tammy and Travis for much of the time after they moved to Iowa. He claimed that Tammy was lying when she said that he did not live with her.

Ed's sister, Connie Kroupa, testified that she has often cared for Travis since his infancy. She stated that she had never seen Tammy do anything dangerous or inappropriate in Travis' presence. Connie testified that she is employed as an in-home nurse and that she would provide care for Travis should custody be awarded to Ed. Connie stated that Travis has a good relationship with Tammy, but that his relationship with Ed is better. She testified that Ed lived with Travis and Tammy in Iowa and that she once saw Tammy hit Ed in the back with a hot skillet.

Entered into evidence on October 18, 1991, was a copy of a petition filed by Tammy on the same date in the district court for Pottawattamie County, Iowa. Tammy requested that the Iowa court establish paternity, award custody of Travis to Tammy, and award child support, attorney fees, and costs to Tammy.

At the end of the October 18 proceedings, the court stated, "I

do not have enough information on either of you that would satisfy me that you are fit and proper to supervise and to nurture the child." The court ordered that a guardian ad litem investigate and report on the parties' fitness.

The court stated that the record did not reflect an illegal act or unlawful removal of the child into Nebraska. Notwithstanding that the petition filed in Iowa to determine Travis' custody was received in evidence at the hearing on October 18, according to the record, the trial court did not inquire or inform the Iowa court of the existence of the Nebraska proceedings. The court stated that "it isn't clear to me that Nebraska is the best place to have this proceeding. I'm going to be relying pretty much exclusively on what the Guardian ad Litem has to say."

The court placed temporary custody of Travis in the court and provided that physical custody would remain with Ed. The court provided that Tammy should be allowed "reasonable, frequent" access to Travis with the proviso that Travis not be taken into Iowa. Tammy was therefore prohibited from exercising any overnight visitations with Travis. The court overruled Tammy's motion to dismiss on jurisdictional grounds, which was filed on October 21, 1991.

*Hearing on Final Custody.*

On December 31, 1992, Tammy again filed a motion to dismiss on jurisdictional grounds. A hearing was held to determine custody of Travis on January 6, 1993. At the outset, Tammy again questioned the court's jurisdiction and asked for a continuing objection on that ground.

Debra Margrave, the guardian ad litem, testified that she had visited with the parties at her office and in their homes and that she had met with Travis four times. She stated that there is a loving relationship between Ed and Travis and also between Tammy and Travis. Margrave stated that Ed was a better disciplinarian than was Tammy.

Margrave testified that Tammy worked in a bar and that Tammy had been saying for the preceding year that she intended to obtain her GED and get a different job. Margrave stated that Tammy said "she didn't want to go back to working a minimum-wage job which is what she would have to do."

Margrave was troubled by Tammy's waiting until a few days before the January 6 hearing to get a job as a waitress and by Tammy's statement that she was doing so only on the advice of her attorney in order to get her son back.

Margrave stated that her suggestion that Travis be with his mother during the day while Ed worked was complied with by Ed "[a]fter a lot of kicking and screaming." She testified that Tammy was to have had visitation with Travis at Thanksgiving, but that Ed had taken him out of town without informing Tammy. Margrave stated that she had to intervene so that Tammy was able to see Travis at Christmas.

Margrave stated that Ed told her that "the only reason that he kept Travis was because he was trying to get [Tammy] to come back to him and that he was absolutely stunned when the Judge allowed him to retain custody of Travis." In her written report entered into evidence, Margrave stated that Ed told her that when he commenced this action, it was not his intention that Travis stay with him indefinitely. Margrave testified that Ed used Travis as a weapon against Tammy because of Tammy's refusal to resume their relationship and that it was "[a]bsolutely not" in Travis' best interests to be used in that manner. Margrave stated that she had never observed Tammy use Travis in a similar manner against Ed.

Margrave stated that she agrees with Tammy's assessment that responsibility for Travis' behavior of calling Tammy names rests with Ed. Margrave stated that both parties talk to Travis about the other, but that Ed does it a lot more than does Tammy.

In her written report, Margrave stated that she was concerned about Tammy's work in a bar. Margrave thought Tammy had been untruthful about her employment plans and about her relationships with other men. Margrave stated that Travis respected Ed's authority more than he did Tammy's authority. Margrave also stated that she was concerned about Travis' diet when he was with Tammy.

Margrave stated that she had "grave concerns about [Ed's] attempts to use Travis as a weapon against [Tammy] and I fear that after the Court scrutiny is gone this may get even worse." Margrave concluded that it was in Travis' best interests to remain in Ed's custody subject to "very structured, specific and

very liberal visitation. . . . I believe it is crucial that [Ed] understand that interference with [Tammy's] visitation could result in the loss of custody of Travis." Margrave testified at the hearing that it was "critical" that visitation be very specifically set out because Ed "has consistently not lived up to what was supposed to happen with the visitation. And unless it's down in black and white, he will not abide by it and we'll be back in court on contempt charges."

Margrave stated in her report and in her testimony that she believed that the district court for Douglas County had no jurisdiction in this case. She noted that both parties had told her that for more than 6 months before the proceedings were commenced, Tammy and Travis lived in Iowa.

The court awarded custody of Travis to Ed, subject to specified visitation by Tammy. The court provided for child support to be paid by Tammy.

## ANALYSIS

Tammy argues on appeal that the district court for Douglas County was not the proper forum for this action. She contends that jurisdiction of this case is in the courts of Iowa, the "home state" of Travis and Tammy.

Interstate custody disputes are governed by the Uniform Child Custody Jurisdiction Act, enacted in Nebraska and codified as Neb. Rev. Stat. § 43-1201 et seq. (Reissue 1988). In determining whether a court should entertain a child custody proceeding having interstate implications, the court should first determine whether it has jurisdiction and then determine whether it is appropriate to exercise jurisdiction. *Van Norman v. Upperman*, 231 Neb. 524, 436 N.W.2d 834 (1989). The relevant jurisdictional provisions of the Nebraska Child Custody Jurisdiction Act are as follows:

(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(a) This state (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this

state because of his or her removal or retention by a person claiming his or her custody or for other reasons, and a parent or person acting as parent continues to live in this state;

(b) It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his or her parents, or the child and at least one contestant, have a significant connection with this state and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

. . . .

(2) Except under subdivisions (c) and (d) of subsection (1) of this section, physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.

(3) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his or her custody.

§ 43-1203.

The act defines "home state" as

the state in which the child immediately preceding the time involved lived with his or her parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons shall be counted as part of the six-month or other period.

§ 43-1202(5).

In its order dated February 24, 1993, the trial court stated that it had jurisdiction over the parties and the subject matter in this action. A docket entry states that the court had jurisdiction pursuant to § 43-1203(1)(b), the subsection which refers to "significant connection[s]" as a basis for jurisdiction.

The comment to § 3 of the Uniform Child Custody Jurisdiction Act, 9 U.L.A. 144-45 (1988), states that home state jurisdiction and significant connections jurisdiction

establish the two major bases for jurisdiction. In the first place, a court in the child's home state has jurisdiction, and secondly, if there is no home state or the child and his family have equal or stronger ties with another state, a court in that state has jurisdiction. If this alternative test produces concurrent jurisdiction in more than one state, the mechanisms provided in [the counterparts in the uniform act to §§ 43-1206 and 43-1207] are used to assure that only one state makes the custody decision.

. . . .

[Section 43-1203(1)(b)] comes into play either when the home state test cannot be met or as an alternative to that test. . . .

Paragraph [(b)] of subsection [(1)] is supplemented by subsection [(2)] which is designed to discourage unilateral removal of children to other states and to guard generally against too liberal an interpretation of paragraph [(b)]. . . .

Paragraph [(b)] perhaps more than any other provision of the Act requires that it be interpreted in the spirit of the legislative purposes expressed in [§ 43-1201]. The paragraph was phrased in general terms in order to be flexible enough to cover many fact situations too diverse to lend themselves to exact description. But its purpose is to limit jurisdiction rather than to proliferate it. The first clause of the paragraph is important: jurisdiction exists only if it is in the *child's* interest, not merely the interest or convenience of the feuding parties, to determine custody in a particular state. The interest of the child is served when the forum has optimum access to relevant evidence about the child and family. There must be maximum rather than minimum contact with the state.

(Emphasis in original.)

In light of the foregoing principles, we now analyze the existence of concurrent jurisdiction, which would trigger the provisions of §§ 43-1206 and 43-1207.

### *Home State Jurisdiction.*

Travis and Tammy lived in Council Bluffs from January 1990 until September 1991. Thus, there is no question that Travis

lived with his mother in Iowa for at least 6 consecutive months prior to the filing of this action, except for the brief time during which Travis visited his grandparents in Arkansas before he was removed by his father to Nebraska. A temporary absence from the child's home state does not defeat home state jurisdiction. § 43-1202(5).

It has been observed that " '[t]he home state concept is . . . of the utmost importance in the Act, requiring the courts, when possible, to choose that forum to adjudicate custody disputes. The children's home is the presumptively correct forum.' " *Mace v. Mace*, 215 Neb. 640, 648, 341 N.W.2d 307, 312-13 (1983) (quoting *Hafer v. Superior Court, County of San Diego*, 126 Cal. App. 3d 856, 179 Cal. Rptr. 132 (1981)). The record demonstrates that Iowa is Travis' home state. As Travis' home state, Iowa clearly had jurisdiction of the action under the Uniform Child Custody Jurisdiction Act.

*Significant Connections Jurisdiction.*

We note that the typical scenario in cases analyzing significant connections jurisdiction involves parents who reside in different areas of the country. Those cases generally present a distinct choice between two jurisdictions, one of which has markedly greater access to evidence regarding the child's best interests. This case differs from that scenario in that the parents involved here, although residing in different states, live in relatively close proximity to each other. We further observe that a stated purpose of the Uniform Child Custody Jurisdiction Act is to discourage unilateral removal of children to other states, inter alia, to gain jurisdictional advantage and to limit the exercise of jurisdiction to cases in which it is in the child's interest to determine custody in that particular state. See Uniform Child Custody Jurisdiction Act § 3 cmt., *supra*. We will analyze the issue of significant connections jurisdiction in light of the principles established under Nebraska law and the Uniform Child Custody Jurisdiction Act.

The record reveals that Nebraska had some contacts with Travis. Travis was born in Nebraska and spent the first 8 to 10 months of his life here. A number of his paternal relatives, some of whom provide care for him, reside in Nebraska. Ed

works in Nebraska. However, it is the state with the maximum contact which properly exercises jurisdiction under the Uniform Child Custody Jurisdiction Act. *Mace v. Mace, supra*. At the time the petition in this case was filed, most of Travis' life had been spent in Iowa with his mother, who provided for his daily care. Although there was a dispute regarding Ed's residence in Iowa, Ed admits he lived in Iowa until his relationship with Tammy ended. A number of Travis' maternal relatives, some of whom provide care for him, live in Iowa. Based on the record before us, we conclude that Iowa is the state which had maximum contacts with Travis and that the trial court erred in determining that Nebraska had jurisdiction under § 43-1203(1)(b).

*Pending Action in Iowa.*

With respect to determining jurisdiction, the law gives guidance to courts which have been made aware of a pending action in another state. Based on the statutory scheme recited below, the trial court, in its assessment of the best interests of the child, was obligated to inquire into the Iowa proceeding or inform the Iowa court of the Nebraska proceeding.

Section 43-1206 provides:

(1) A court of this state shall not exercise its jurisdiction under sections 43-1201 to 43-1225 if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this act, unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons.

(2) Before hearing the petition in a custody proceeding the court shall examine the pleadings and other information supplied by the parties under section 43-1209 and shall consult the child custody registry established under section 43-1216 concerning the pendency of proceedings with respect to the child in other states. If the court has reason to believe that proceedings may be pending in another state it shall direct an inquiry to the

state court administrator or other appropriate official of the other state.

(3) If the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged in accordance with sections 43-1219 to 43-1222. If a court of this state has made a custody decree before being informed of a pending proceeding in a court of another state it shall immediately inform that court of the fact. If the court is informed that a proceeding was commenced in another state after it assumed jurisdiction it shall likewise inform the other court to the end that the issues may be litigated in the more appropriate forum.

The comment to § 6 of the Uniform Child Custody Jurisdiction Act, 9 U.L.A. 220 (1988), states that

[b]ecause of the havoc wreaked by simultaneous and competitive jurisdiction . . . this section seeks to avoid jurisdictional conflict with all feasible means, including novel methods. Courts are expected to take an active part under this section in seeking out information about custody proceedings concerning the same child pending in other states. In a proper case jurisdiction is yielded to the other state either under [§ 43-1206 or § 43-1207]. Both sections must be read together.

When the courts of more than one state have jurisdiction . . . priority in time determines which court will proceed with the action, but the application of the inconvenient forum principle of [§ 43-1207] may result in the handling of the case by the other court.

While jurisdiction need not be yielded under [§ 43-1206(1)] if the other court would not have jurisdiction under the criteria of this Act, the policy against simultaneous custody proceedings is so strong that it might in a particular situation be appropriate to leave

the case to the other court even under such circumstances . . . .

The district court was aware from the outset of Tammy's contention that the matter should be determined in Iowa. On October 18, 1991, the second day of the hearing on jurisdiction, Tammy entered into evidence a copy of the custody petition filed that same date in an Iowa district court. Having thus been advised of the proceedings pending in Iowa, the court, at a minimum, should have communicated with court officials in Iowa to determine the appropriate forum. See § 43-1206(2) and (3). There is no indication in the record that the trial court inquired of Iowa officials or informed them of this action.

The exercise of jurisdiction by Nebraska would contravene several of the purposes stated in § 43-1201, most notably subsection (e), which relates to deterrence of abductions and other unilateral removals of children undertaken to obtain jurisdictional advantage and custody awards. The district court's failure to communicate with the Iowa court to determine the most appropriate forum contravenes § 43-1201(a) through (c), which relate to the avoidance of jurisdictional conflicts.

## CONCLUSION

The district court's exercise of jurisdiction in this case was improper under and contravened the purposes of the Nebraska Child Custody Jursidction Act. For this reason, the order of the district court is reversed, and the cause is remanded to the district court with directions to dismiss. We are aware that a dismissal of this action will no doubt cause a refiling, and we are further aware of the factual anomalies due to the passage of time which will present themselves to the new trial court. We trust that the new trial court will properly evaluate the facts in light of the history of the case. Nevertheless, we are required to order dismissal under the Nebraska Child Custody Jurisdiction Act.

In view of our decision, we need not address Tammy's remaining assignments of error.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.